**Clarence David MINTON, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 28798.**

Court of Criminal Appeals of Texas.

March 20, 1957.

Roy Joe Stevens, Canyon, for appellant.

Wayne Bagbey, Dist. Atty., Amarillo, and Leon B. Douglas, State's Atty., Austin, for the State.

WOODLEY, Judge.

The offense is murder; the punishment, 25 years.

A prior conviction with the same punishment was reversed because of error in argument. Minton v. State, Tex.Cr.App., 285 S.W.2d 760.

About 3 P.M. on Sunday, February 20th, the dead and frozen body of Joe McLeod was discovered in a "two room shack" occupied by appellant and Willie Mae Minton.

No one was there when Ed Price saw the body through a window, investigated and had the officers notified.

The witness who last saw the deceased alive was Lloyd Cox, brother of Willie Mae Minton. He testified that when he left the house about 4 or 5 o'clock in the afternoon on Friday, February 18, 1955, Willie Mae was laying on the bed "passed out"; appellant was sitting on the bed and was "not too drunk" and the deceased, the only other person then present, was sitting in a rocking chair by the stove.

The testimony shows that during Thursday and Friday there were several persons in the house drinking bay rum, including appellant and Willie Mae, and the deceased Joe McLeod.

Ed Price, who found the body, testified that he was at appellant's house on Thursday, February 17, 1955, and saw the de-

ceased and Lloyd Cox drinking "a little bay rum there". Price also testified that the following morning he was at the house and saw no one except Willie Mae and appellant; that appellant went with him to sell some junk and he gave appellant a dollar and did not see him again "until this court came up."

The record shows that Willie Mae Minton was present at the trial and available to appellant as a witness, and there was evidence to the effect that she was appellant's wife and not available to the State.

The autopsy upon the body of the deceased revealed abrasions and bruises over the entire upper chest and extending down over the upper part of the right side of the abdomen; contusion of the scrotum and penis and contused areas on the back on each side of the spinal column; multiple fractures just under the collar bone extending from the second to the tenth rib, all of which were fractured on the right or front; fractures of the sixth and seventh ribs at the juncture of the vertebra and spinal column; fracture of the right arm about six inches below the shoulder; a huge egg shaped laceration or tearing on the right lobe of the liver, cutting the liver in half; contusion or bruise over the upper pole of the right kidney and rupture of the pelvic portion of the kidney; linear fractures of the skull extending from behind the left eye backward to above the left ear, involving the inner table of the skull; a broken nose and contused and bruised area on the front of the face, more over the left than the right eye; multiple spots or hemorrhage that goes with fracture "were found in the brain."

The State offered in evidence the voluntary confession of appellant which, omitting the warning, reads:

"My name is Clarence David Minton. I am 44 years of age, having been born on January 27, 1911. I have lived in Amarillo off and on since 1927. I was born at Erick, Oklahoma. I met my wife, Willie Mae Minton, about five years ago. She is my common law wife. On the afternoon of the day Joe McLeod was killed, Thursday, February 17, 1955, we had all been drinking out at my house. We drank up until about 2 A.M. of Friday, February 18, 1955, then Willie Mae and me went to bed at about that time. About two hours after we went to bed, Joe McLeod came in out of the other room and said he was cold and got in bed with us. *Joe must have figured that I was passed out so I just kept quiet to see what would happen. When Joe started playing with Willie Mae I got mad and throwed him out of bed. I then got out of bed and stomped him with my feet. I didn't have my shoes on. He still wouldn't go in the other room so I picked up a stick and said, 'Damn you, you will go in the other room.' I hit him with the stick and he said, 'I'm still not going,' so I grabbed him by the seat of the pants and shirt and throwed him into the next room.* When I had thrown him out of the bed he asked me if he could stay the rest of the night because it was cold outside. I told him he could but he would have to leave the next morning. The next morning I looked in there where Joe was and he was still laying in there so I told Willie Mae to get up and let's go and get a drink. We went up to Ed Price's and I borrowed a dollar off of him, from there we went over to Rutledge's Grocery and bought two (2) bottles of bay rum and then we went on over to Frank Crow's. We stayed at his house until Sunday at about 3 o'clock and the police picked us up on the way home."

Appellant's relation with Willie Mae is made a crucial point in appellant's brief for it is contended that the italicized portion of the confession is exculpatory, was not disproved, and establishes that appellant was repelling the deceased's improper and unlawful act in taking liberties of a

sexual nature with his wife, which gave him the right to defend his wife and justified the homicide, or in any event, by reason of the deceased's conduct toward his wife, he was at most guilty of murder without malice.

It is also contended that the court commented upon the weight of the evidence "in referring as to whether a common law marriage in fact did exist, when it is conclusive in this case that one did exist, since the State is bound by the Defendant's confession introduced in toto by the State, and not disproved by the State."

As to the relationship between appellant and Willie Mae, the record contains the following. Appellant stated in his confession: "I met my wife, Willie Mae Minton about five years ago. She is my common law wife."

Ed Price testified:

"Q. How long have you known Clarence David Minton? A. I have known Buck quite a long time.

"Q. You call him Buck Minton? A. Yes sir.

"Q. And Willie Mae? A. That is Buck's ex-wife.

"Q. How long have you known Buck and Willie Mae as man and wife? A. Well, I have known Buck and Willie Mae for several years, and they have been together for several years.

"Q. And they held themselves out as man and wife? A. Yes, and they said they were married in Oklahoma, but of course I didn't know nothing about that. * * *

"Q. Did you ever know whether or not Buck was married before? A. Well, no I didn't know whether he had been married before.

"Q. Does Buck have any children? A. He told me awhile back he had been married once."

Willie Mae's brother Lloyd Cox testified:

"Q. How long has she (Willie Mae) been living with Buck? A. About 8 or 10 years I imagine."

George Cox, another brother, testified:

"Q. How long has Buck and Willie Mae been married? A. I would say right around 10 years I believe."

In Paragraph 7 of the Court's charge the jury was instructed: "Now, if at the time and place in question a common law marriage (as same is hereinafter defined) existed between the defendant and Willa Mae Minton, and that in the home of the defendant at 80 Ong Street, in Amarillo, Texas, one Joe McLeod, the deceased, got in bed with the defendant and his wife and started playing with defendant's wife, and if you further find that the means used by the defendant to stop such conduct on the part of the deceased was reasonable and necessary, viewed from the standpoint of the defendant at the time, then, if you so find and believe from the evidence, or have a reasonable doubt thereof, you will acquit the defendant and say by your verdict, not guilty."

The court further charged the jury, in Paragraph 9, that appellant's right to repel the attack, if any, upon Willie Mae would not be lost if the jury did not find that she was his common law wife, provided no more force was used than was reasonably necessary viewed from the standpoint of the defendant at the time.

The court also instructed the jury that a homicide committed for the purpose of preventing rape was lawful; and that the State was bound by the whole confession unless and until the jury found beyond a reasonable doubt that the exculpatory statements therein contained, if any, were untrue.

It will be seen that the charge required an acquittal if appellant used only such force as, viewed from his standpoint, was reasonable and necessary whether Willie Mae was appellant's wife or not.

There was no testimony from appellant or from Willie Mae and the court's charge in the particulars mentioned appears to have been more favorable to appellant than called for by the confession.

In view of this fact, and of the evidence relating to the marital status of appellant and Willie Mae, we find no reversible error in the court's charge wherein the jury was required, in Paragraph 7, to find that a common law marriage existed between appellant and Willie Mae.

We overrule the contention that the killing, under the exculpatory statements of the confession, was as a matter of law justified or that the offense was no greater than murder without malice.

The judgment is affirmed.